UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| USIC LOCATING SERVICES, INC., | ) | |
| | ) | |
| Plaintiff and Counter Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ONE CALL LOCATORS, LTD. doing | ) | No. 1:11-cv-00071-SEB-DKL |
| business as ELM LOCATING & UTILITY | ) | |
| SERVICES, | ) | |
| LEE C. GRAVES, | ) | |
| | ) | |
| Defendants and Counter Plaintiffs. | ) | |

**ORDER ON PENDING MOTIONS**

This cause is before the Court on Plaintiff USIC Locating Services, Inc.'s ("USIC")

motion for summary judgment [Docket No. 52] and motion to compel arbitration [Docket No.

80]. Defendants One Call Locators, Ltd. ("One Call") and Lee Graves ("Graves") oppose both

motions by Plaintiff. For the reasons detailed herein, we <u>GRANT</u> USIC's motion for summary

judgment.[1]  USIC's motion to compel arbitration and stay litigation of Defendants' amended

counterclaims is also <u>GRANTED</u>.

> **I.     Factual Background**

Both One Call and USIC are in the business of locating underground utilities. Graves is

the primary owner of One Call. On September 1, 2010, the parties entered into an Asset Purchase

---

[1] USIC has also filed a motion to dismiss Defendants' counterclaims [Docket No. 82], which is <u>DENIED AS MOOT</u> in light of our decision to compel arbitration of these counterclaims. USIC has also filed a motion to strike Defendants' jury demand [Docket No. 84], which Defendants do not oppose. Thus, this motion is <u>GRANTED</u>.

Agreement (the "Agreement") whereby USIC purchased a substantial portion of One Call's business assets located in Florida, Illinois, and Minnesota.[2]

Accounts Receivable

Pursuant to the Agreement, the assets to be conveyed to USIC by One Call included:  (a) all Accounts Receivable; (b) all Equipment; (c) all rights in, to and under the Contracts listed on the Assigned Contracts Schedule; (d) all rights of One Call to deposits, prepaid expenses and security deposits related to the Business listed on the Deposits Schedule; (e) all Intangible Assets; (f) all Confidential Information; (g) all Files and Records; (h) all Licenses and Permits; (i) all claims of One Call against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent, and (j) all other fixed assets listed on the Assets Schedule.  Pursuant to Section 1.01 of the Agreement, USIC acquired all "right, title, and interest" to these assets "at the Closing," which meant on September 30, 2010, when the Closing occurred.

According to USIC Senior Vice President and Chief Financial Officer Michael Quinn, One Call wrongfully continued to collect and retain $1,514,286.00 in accounts receivable following the closing date.  On December 1, 2010, when the funds were still not forthcoming, Philip Kryder, USIC's Director of Finance, demanded that One Call promptly remit these amounts to USIC via wire transfer; still, One Call failed to comply.

One Call does not dispute that it continued to collect and retain these accounts receivable beyond the September 30, 2010 deadline, but, according to Graves, neither he nor his company took any "affirmative action" to actually collect these amounts; by their telling, the funds apparently

---

[2] On September 29, 2010, the day before the anticipated closing of the transaction, USIC insisted on the adoption of an amendment to the original version of the purchase agreement as a condition of the closing by which certain terms in the original version of the purchase agreement were superseded.  We have noted these amendments wherever relevant.

just continued to roll in to One Call's coffers. One Call and Graves maintain that they assumed that, following the closing, USIC would protect its investment by contacting affected customers to arrange for payments to be made directly to USIC, rather than allowing these monies to continue to be paid to One Call. One Call and Graves also assumed that the various amounts due between the parties (including the Deferred Amount discussed below, the accounts receivable, and any post-closing costs that the parties incurred[3]) would be sorted out as part of the twelve-month revenue adjustment accounting process (discussed below). They invoke the procedures outlined in Section 1.06 of the Agreement to support their assumptions.

USIC's payment method in purchasing One Call's assets under the Agreement is by any standard a complicated process. In addition to the $7,750,000 payable to One Call by USIC at Closing, USIC was obligated to pay as a "Deferred Amount" an additional $1,750,000. Specifically, the Agreement provided:

> Purchaser [USIC] shall pay Seller [One Call] an amount up to One Million Seven Hundred Fifty Thousand Dollars ($1,750,0000)(the "Deferred Amount") subject to Section 1.06 and the provisions of Article VII, no later than five (5) calendar days following the final determination of the Final Twelve Month Period TTM Revenue in accordance with Section 1.06(b).

First Amendment to Agreement § 1.2. The Agreement also contemplated two adjustments to the purchase price, a "Working Capital Adjustment" and a "Revenue Adjustment." See Agreement § 1.06. How and when these two adjustments were to be applied comprises a major part of the parties' dispute.

<u>The Working Capital Adjustment</u>

---

[3] Graves testified that following the closing date, One Call and USIC have both accrued costs and credits associated with the Agreement. Graves Aff. ¶ 14. As an example, he points to certain training labor costs, accounts payable, and stay bonus payments totaling more than $153,516 that USIC allegedly owes One Call pursuant to discussions between counsel occurring in January 2011. Id. However, Defendants do not point to any provision of the Agreement that substantiates One Call's entitlement to these amounts.

Section 1.06(a) of the Agreement encompasses the "Working Capital Adjustment."[4]

Pursuant to this section, One Call was required to inform USIC of its estimate of the amount of

the working capital of the business as of the close of business on the day prior to the closing of

the transaction as well as its estimate of the amount, if any, that One Call believed the purchase

price would need to be adjusted based on that amount.  Within 30 days after receiving One Call's

estimate, USIC was to inform One Call of any disagreement it may have with these

computations.  After resolving any disagreements if possible, the parties were then obligated to

calculate the Final Working Capital, based on an exchange of documentation and, if their

differences could not be resolved, they agreed to submit the matter to an independent auditor.

The parties were able to agree on the amount of the Working Capital Adjustment, setting

the amount at $450,718.34 as of November 29, 2010.  Because this amount was less than the

Estimated Working Capital (as determined at the time of closing), the following provision of the

Agreement was invoked:

> Section 1.3.  Section 1.06(vi) of the Purchase Agreement is hereby amended and restated in its entirety as follows:
>
> "In the event that the Final Working Capital is less than the Estimated Working Capital, then [One Call] shall, within five (5) calendar days after the determination thereof, pay to [USIC] an amount equal to such difference, by wire transfer of immediately available funds to an account designated in writing by [USIC]; provided, however, that if [One Call] fails to pay such difference, [USIC] may deduct from the Deferred Amount otherwise payable to [One Call] pursuant to Section 1.05 an amount equal to such difference."[5]

---

[4] The working capital of a company is determined by a measurement of the company's current assets and liabilities. The Working Capital Adjustment in the parties' Agreement was meant to account for the inevitable differences between the "Target Working Capital," which the parties agreed was equal to $1,850,000 at the time they executed the Agreement, and the "Final Working Capital," which the parties were to determine closer to the actual date of Closing pursuant to the processes stated in Section 1.06(a).

[5] The original version of Section 1.06(a)(vi) provided as follows:

> (vi) In the event that the Final Working Capital is less than the Estimated Working Capital, then Purchaser shall deduct from the Deferred Amount otherwise payable to Seller pursuant to Section 1.05 an amount equal to such difference.

<u>The Revenue Adjustment</u>

The Revenue Adjustment was to be determined by a process set to commence "no later than forty-five (45) calendar days following the twelve month anniversary of the Closing Date." Agreement § 1.06(b).  At such time, USIC would provide One Call with its estimate of the "Twelve Month Period TTM Revenue"[6] as well as USIC's estimate of any adjustments to the purchase price based on that amount.  Within 10 days of receipt of this estimate, One Call was to notify USIC regarding whether it agreed with USIC's calculations, following which the parties would calculate a final determination of the Final Twelve Month Period TTM Revenue, based on an exchange of documentation and, again, if necessary, submission of any disputes to an independent auditor.[7]

The procedure for calculating and paying out any amounts due based on the Revenue Adjustment vis-a-vis the Deferred Amount was set out in the Agreement, as follows:

> (v) In the event that the Final Twelve Month Period TTM Revenue is greater than the Target Revenue, then [USIC] shall, within five (5) calendar days after the determination thereof, pay to [One Call] an amount equal to such difference, by wire transfer of immediately available funds to an account designated in writing by [One Call] and pay to [One Call] the entire Deferred Amount, by wire transfer of immediately available funds to an account designated in writing by [One Call].
>
> (vi) In the event that the Final Twelve Month Period TTM Revenue is less than the Target Revenue (the amount of such difference, the "Deficiency") and the amount of the Deficiency is less than the Deferred Amount, then [UISC] shall deduct from the Deferred Amount an amount equal to the Deficiency and [USIC] shall, within five (5) calendar days after the determination thereof, pay to [One Call] the remaining Deferred Amount by wire transfer of immediately available funds to an account designated in writing by [One Call].
>
> (vii) In the event that the Final Twelve Month Period TTM Revenue is less than the Target Revenue and the amount of the Deficiency is equal to or greater than

---

[6] The Agreement defined this amount as "equal to the aggregate revenue of the Business" and included detailed instructions for the manner in which the amount was to be calculated.

[7] USIC's Motion to Compel Arbitration is based on this provision in the Agreement.  We discuss it more fully below.

5

the Deferred Amount, then [USIC] shall retain the entire Deferred Amount and [One Call] shall pay to [USIC] any remaining amount of the Deficiency, by wire transfer of immediately available funds to an account designated in writing by [USIC], within five (5) calendar days after the determination of the Final Twelve Month Period TTM Revenue.

USIC informed One Call of its estimate of the Final Twelve Month Period TTM Revenue figure(s) on October 24, 2011, pursuant to Section 1.06(b)(i) of the Agreement.  Thereafter, on November 3, 2011, pursuant to Section 1.06(b)(ii), One Call notified USIC that it disputed the USIC estimate.  Following the passage of the thirty day period during which the parties were to negotiate a resolution to their dispute, if they could successfully do so, when they were unable to reach a solution or compromise, the parties agreed to enlist Crowe Horwath LLP, an Illinois accounting firm, as the independent auditor and arbitrator, consistent with Section 1.06(b)(iv).

In early January 2012, representatives of One Call traveled to USIC's offices in Indianapolis to perform an anticipated week-long document review process relating to the scheduled arbitration. Two days into their review, however, their efforts were halted.  As One Call's counsel informed USIC's counsel by letter, the reason for the cessation of One Call's review was that USIC had refused to give One Call's representatives the documents One Call had requested.  One Call's counsel further informed USIC's counsel that One Call had advised the independent auditor that because it was unable to conduct the document review, it was also unable to participate in the arbitration at that time.

 The Agreement imposed on One Call and Graves joint and several responsibility to indemnify USIC in the event One Call or Graves breached the Agreement, thereby protected USIC "from and against any and all damages, loss, obligations, liabilities, claims, encumbrances, penalties, costs and expenses (including costs of investigation and defense and reasonable

attorneys' fees and expenses)" arising from any breach of the Agreement by One Call or Graves. Agreement § 7.01.

## II.     Procedural Background

Ninety days after the closing of the Asset Purchases Agreement, that is, on December 30, 2010, USIC's counsel sent Graves an email demanding payment of the proceeds of the accounts receivables that One Call had continued to receive and collect as well as payment of "the difference between the Estimated Working Capital and Final Working Capital ($450,000)." This demand reminded Graves that he was personally liable to USIC to indemnify it against losses (including costs and attorney fees) under the Agreement.  For a full year after the date of the Closing, despite USIC's demands for payment, One Call failed to make any of these required payouts.  At this time this lawsuit was filed by USIC, the amount of the Deferred Amount had not been determined and USIC remains unable to pay any amount that it may owe to One Call. One Call's response to USIC's demand, was to seek a declaratory ruling that any payments to which USIC may be entitled are not due until the Deferred Amount had been finally calculated. That litigation was filed in state court in Illinois and later removed in the Northern District of Illinois.

In January 2011, USIC filed its Complaint against One Call and Graves in this district, seeking payment of the accounts receivable indebtedness, the Working Capital Adjustment, and attorneys' fees associated with this litigation.  USIC's Complaint includes claims for breach of contract against both One Call and Graves as well as claims for conversion and unjust enrichment against only One Call.  The Illinois litigation was transferred to our court and consolidated with this cause of action in August 2011.  [Docket No. 37].  USIC filed the pending motion for summary judgment [Docket No. 52] in January 2012.

Defendants' rejoinder to USIC's lawsuit was a motion for leave to file an amended answer to USIC's Complaint and to add counterclaims for breach of contract (Count II), fraud (Count III), and unjust enrichment (Count IV).  Defendants also supplemented their original request for declaratory judgment to include a declaration that "Defendants are entitled to be paid the Deferred Amount under the APA, that no monies are due to USIC and that USIC is not entitled to a determination of attorneys' fees."  Am. Counterclaim ¶ 24.  Overruling Plaintiff's opposition to the filing of these amendments, the Magistrate Judge granted Defendants' motion to amend their Answer and file their Counterclaims on the grounds that "USIC's challenges to the sufficiency of One Call's counterclaims are better addressed on their merits through motion practice, based on fully developed legal and factual presentations."  Docket No. 75. Accordingly, Defendants' Amended Answer and Counterclaims were filed and USIC's motion to compel arbitration [Docket No. 80] ensued.

### III.    Legal Analysis

### A.    USIC's Motion for Summary Judgment

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.  However, neither the "mere existence of some alleged factual dispute between the parties,"

8

id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

USIC requests that the Court enter summary judgment in its favor with respect to its breach of contract and conversion claims.[8]  We discuss these claims below.[9]

1.      Breach of Contract Claims

Under Illinois law, which the parties stipulate applies to this dispute, to prevail on a breach of contract claim, a plaintiff must prove each of the following elements: (1) the existence of a contract; (2) plaintiff's performance of all contractual obligations required of it; (3) facts constituting the alleged breach; and (4) the existence of damages resulting from the breach. Costa v. Stephens-Adamson, Inc., 142 Ill. App. 3d 798, 799-800 (Ill. App. Ct. 2d Dist. 1986). The parties further stipulate that their purchase agreement constitutes a valid and enforceable contract.  Defendants have proffered no evidence to establish that USIC failed to perform its contractual obligations under the Agreement (at least as of the time of Defendants' alleged breaches).[10]  Defendants also do not dispute USIC's assertion of damages in the amount of $1,965.004.30, plus prejudgment and post-judgment interest.

Thus, the focus of the pending motions is on whether the facts as framed by USIC in its Complaint establish a breach of the Agreement by Defendants.  Because, for the reasons explained below, we conclude that Defendants' failure to remit the Accounts Receivable to USIC and their failure to pay USIC the Working Capital Adjustment constitutes breaches of the

---

[8] USIC's Complaint includes a claim for Unjust Enrichment (Count II) based on One Call's refusal to compensate USIC for the Accounts Receivable and the Working Capital Adjustment.  However, there is no mention of this claim in USIC's opening brief or reply brief.  Thus, our ruling omits any resolution of this issue.

[9] Defendants contend that USIC's motion must fail because it improperly seeks summary judgment as to only a part of its claim.  Defendants contend that USIC's request for relief is "incomplete" in that it seeks amounts arguably due USIC without acknowledging sums that Defendants maintain that USIC owes them.  However, USIC's summary judgment motion addresses *its* entire breach of contract and conversion claims against One Call.  It is Defendants' duty to advance any claim they may wish to assert for breach of contract (as they have done) and/or to adduce sufficient evidence to establish a basis to excuse their breach.  There is nothing procedurally improper in USIC's having brought the instant motion for summary judgment addressed only to its own claims.

[10] Defendants devote a major portion of their responsive briefing to the assertion that USIC's conduct relating to the determination and payment of the Deferred Amount was itself a breach of the Agreement.  However, this alleged conduct had not occurred when Defendants' alleged breaches of the Agreement occurred.  Thus, for purposes of resolving USIC's motion, this contention is irrelevant.

parties' Agreement, we hold that USIC is entitled to summary judgment on its breach of contract claim.

                a.       Accounts Receivable

       USIC first contends that Defendants breached the Agreement by continuing to collect a total of $1,514,286.59 as accounts receivable following the closing date and by failing to remit those proceeds to USIC.  Section 1.01 of the Agreement provides:

> Section 1.01. Assets. Upon the terms and subject to the conditions set forth in this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of the right, title and interest in and to all of the following properties, assets and interests in the properties and assets of Seller (whether tangible or intangible) of any kind, nature, character and description used or useful in the Business, whether personal, accrued, contingent or otherwise, and wherever situated, which are owned or leased by Seller in the Business (collectively, the "Assets"), free and clear of all Encumbrances, other than Permitted Encumbrances:
>
>       (a) all Accounts Receivable. . . .

Agreement § 1.01 (emphasis added).  By the clear, express terms of the Agreement, the accounts receivable were transferrable to USIC as of September 30, 2010, the date of the closing.

       Defendants maintain that rather than being a plainly stated obligation of One Call, an ambiguity exists in the Agreement regarding the point when the accounts receivable were due and payable to USIC, and that such an ambiguity creates a triable issue of fact, which suffices to defeat summary judgment.  Because the Agreement sets out a reconciliation process by which the Working Capital Adjustment to the purchase price and the deferred portion of the purchase price are to be determined, it is not at all clear, say Defendants, when payment of the accounts receivables was actually due.  Agreement § 1.06(a).  Defendants further argue that since the Agreement defines "Working Capital" as "current assets (but consisting only of Accounts

Receivable, Unbilled Accounts Receivable and Prepaid Items), less current liabilities (but consisting only of Trade Payables and current liabilities related to vehicle and computer leases)," the Agreement arguably allows Defendants to defer payment of the accounts receivables to USIC until such time as the Working Capital Adjustment had been computed and paid.

We are not convinced that the Agreement is in fact ambiguous based on the reference to "Accounts Receivable" in the definition of "Working Capital." One Call concedes that it continued to collect a total of $1,514,286.59 as Accounts Receivables *after* September 30, 2010, the date of the closing of the transaction. The Working Capital Adjustment, which addresses various post-closing accounting adjustments neither trumps nor renders ambiguous the provision making accounts receivable transferable as of the Closing. It is difficult to imagine language any clearer than that contained in Section 1.01(a).

Defendants also contend that "nowhere in [the Agreement] is there a provision that required One Call to pay over collected Accounts Receivable forthwith upon receipt." While it is abundantly clear that title to the accounts receivable passed to USIC at the time of Closing, Defendants are correct in noting that the Agreement is silent with regard to the procedural mechanics for effectuating that transfer. There is no requirement that a contract embrace every fact or eventuality within its terms to be enforceable. So long as the silence – or the gaps – in the contract do not render other parts ambiguous or uncertain or unenforceable, the express terms should be interpreted as controlling. Obviously, the parties before us could likely have avoided this dispute altogether had their Agreement spelled out a process for redirecting accounts receivable monies to USIC post-closing, but One Call was nonetheless obligated to collect and pay over these amounts in some fashion, without simply assuming that USIC would eventually

"get credit" for them when other aspects of the Agreement were performed.[11]  Such an interpretation is unreasonable in light of the clear requirements of Section 1.01(a).  We hold that it was a breach of the Agreement when One Call failed to transfer the accounts receivable, irrespective of the mechanics of the process.  To hold otherwise would amount to an unjustified judicial revision of this portion of the Agreement.[12]

> b.     The Working Capital Adjustment

USIC maintains that the Working Capital Adjustment ($450,718.34) became due on December 4, 2010, five days after the parties determined the final working capital amount.[13]  In support of this contention, USIC cites as mandatory the following passage in the Agreement:

> In the event that the Final Working Capital is less than the Estimated Working Capital, then **Seller shall, within five (5) calendar days after the determination thereof, pay to Purchaser an amount equal to such difference, by wire transfer of immediately available funds to an account designated in writing by Purchaser**; provided, however, that if Seller fails to pay such difference, Purchaser may deduct from the Deferred Amount otherwise payable to Seller pursuant to Section 1.05 an amount equal to such difference.

First Am. To Purchase Agreement §1.3 (emphasis added).

Defendants contend that this language is ambiguous in terms of when the Working Capital Adjustment is actually due and owing.  They argue that this ambiguity creates a triable issue of fact with regard to whether they were in breach of the Agreement by failing to pay the Working Capital Adjustment by December 4, 2010.  Specifically, Defendants contend that the final clause beginning with the words, "provided, however," gave them the option not to pay

---

[11] One of the reasons Defendants' arguments are unpersuasive is that they are inconsistent.  Defendants assert in their briefing that they "assumed that USIC had arranged to receive any [accounts receivable] directly" while, in the next paragraph, they claim that they had no concern when the accounts receivable continued to flow into One Call's coffers because they interpreted the Agreement to allow them to continue to collect the amounts until the Final Twelve Month Period TTM Revenue reconciliation occurred.

[12] One Call's continued refusal to turn over the proceeds of the accounts receivable also constitutes a conversion, as we discuss below.

[13] As noted above, the parties agree that the Working Capital Adjustment was $450,718.34 as of November 29, 2010.

USIC by December 4, 2010, because USIC was authorized to deduct the Working Capital

Adjustment from the Deferred Amount due One Call after one year.  Defendants rely on

Graves's deposition testimony in support of this interpretation in which he said that he

"understood that the 'provided, however,' proviso [in Section 1.3] defined an exception to the

preceding 'shall' clause" allowing an "alternate means for One Call to be debited a Final

Working Capital amount, if one were to exist."   Graves further testified that he believed offering

such an option was a way by which "USIC was trying to make the increased Deferred Amount

more palatable to One Call."[14]  Defs.' Ex. 16 ¶ 12.

These arguments notwithstanding, we agree with USIC that Section 1.3 unambiguously

obligated One Call to pay USIC the Working Capital Adjustment within five days after that

determination was made.  Defendants' claimed ambiguity is unconvincing, and, in fact, Graves's

subjective belief regarding the meaning of this part of the purchase agreement is both irrelevant

and  inadmissible.  See Home Ins. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d 763, 768

(7th Cir. Ill. 1995)("Subjective" evidence of ambiguity is 'the testimony of the parties

themselves as to what they believe the contract means,' which is invariably self-serving,

inherently difficult to verify and thus, inadmissible.").  The clear meaning of the "provided,

however" clause was to give USIC recourse in the event that One Call failed to pay the Working

Capital Adjustment as otherwise required by that Section.

Defendants do not dispute that the Working Capital Adjustment figure was computed as

$450,718.34 as of November 29, 2010.  Thus, by the clear terms of the parties' Agreement, One

---

[14] One of the amendments to the original version of the Agreement allowed a decrease in the amount USIC would pay at closing and a corresponding increase to the Deferred Amount.

Call was obligated to pay USIC that amount by wire transfer on or before December 4, 2010, making One Call's failure to do so a breach of the Agreement.[15]

  2.  Conversion Claim

  USIC's next contention is that One Call's refusal to remit the proceeds of the Accounts Receivable collected after the closing constitutes a conversion of USIC's property.  Under Illinois law, the elements of conversion are: (1) plaintiff has a right to the property; (2) plaintiff has an absolute and unconditional right to the immediate possession of the property; (3) plaintiff made a demand for possession; (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.  Bill Marek's the Competitive Edge, Inc. v. Mickelson Group, Inc., 806 N.E.2d 280, 285 (Ill. App. Ct. 2004).

  One Call's sole rejoinder to USIC's claim for conversion is that USIC failed to establish the first and second elements of that claim, to wit, USIC's right to immediate possession of the proceeds of the Accounts Receivable, because "there are triable issues of fact as to whether the calculation of such sums can first be ascertained only as part of the APA's post-twelve month computation (APA, § 1.06), a process which has not yet been completed."  However, as discussed above, we have held that the Agreement unambiguously establishes USIC's right to the Accounts Receivable as of the date of the closing of the transaction.  One Call does not dispute that it collected $1,514,286.59 in Accounts Receivable after the closing of the transaction and that it refused to remit and has continued to withhold those amounts to USIC after USIC made a demand for those proceeds.  Thus, we hold that USIC is entitled to summary judgment with regard to its conversion claim against One Call.

  **B.**  **USIC's Motion to Compel Arbitration**

---

[15] As noted above, the parties agreed that One Call and Graves were obligated to indemnify USIC jointly and severally in the event either breached the Agreement.  Thus, final judgment shall enter against both Defendants.

As noted above, Defendants' Amended Answer and Counterclaim contains allegations of breach of contract (Count II), fraud (Count III), and unjust enrichment (Count IV). Defendants also seek a declaration that "Defendants are entitled to be paid the Deferred Amount under the APA, that no monies are due to USIC and that USIC is not entitled to a determination of attorneys' fees." Am. Counterclaim ¶ 24. The factual premise of Defendants' breach of contract, fraud, and unjust enrichment counterclaims is that USIC has failed to pay Defendants the Deferred Amount, failed to act in good faith throughout the accounting process that the Agreement specifies is to be followed to determine the Revenue Adjustment and, ultimately, the Deferred Amount, and that USIC failed to protect Defendants' interest in the Deferred Amount.[16] USIC argues that, pursuant to the Agreement, these matters are to be decided by an Independent Accountant serving as an arbitrator and, thus, requests that we compel arbitration of Defendants' counterclaims and stay the litigation of those counterclaims.[17]

As recently explained by a decision from our sister district court within this circuit:

The [Federal Arbitration Act] reflects a liberal policy in favor of arbitration as a means of settling disputes. Despite strong federal public policy in favor of arbitration, courts ultimately interpret arbitration agreements based on the intent of the parties. A court cannot force a party to arbitrate a claim it has not previously agreed to arbitrate. A court also may not expand the application of an arbitration clause beyond its intended scope.

Thus, when presented with a question of arbitrability, the court will defer to the parties' intent to determine: (1) whether a valid arbitration agreement exists; and (2) whether the scope of the parties' dispute falls within that agreement.

---

[16] Defendants allege that USIC engaged in conduct that effectively reduced the revenue of the business in the year after the transaction closed. Reducing the revenue of the business was detrimental to Defendants because, under the process detailed in Section 1.06(b), reducing revenue allowed USIC to deduct portions of the deferred amount that it owed to One Call.

[17] When a district court determines that a claim falls within the ambit of a valid arbitration agreement, the court ordinarily compels arbitration and stays judicial proceedings as opposed to dismissing the claim. OCMC, Inc. v. Billing Concepts, Inc., No. 1:05-cv-1396-DFH-TAB, 2006 U.S. Dist. LEXIS 25852, at *14 (S.D. Ind. May 3, 2006)(citing 9 U.S.C. §§ 3, 4).

Samovsky v. Macy's, No. 12 C 4261, 2013 U.S. Dist. LEXIS 3717, at *4-5 (N.D. Ill. Jan. 10, 2013) (internal citations omitted).  Courts apply state law to determine whether the parties have agreed to arbitrate their dispute, keeping in mind the federal policy favoring arbitration.  Cont'l Cas. Co. v. Am. Nat. Ins. Co., 417 F.3d 727, 730-31 (7th Cir. 2005).  Those opposing arbitration (in this case, Defendants) bear the burden of establishing why the arbitration provision should not be enforced.  Montgomery v. Corinthian Colleges, Inc., No. 11 C 365, 2011 U.S. Dist. LEXIS 31651, at *7-8 (N.D. Ill. Mar. 25, 2011).  For the reasons detailed below, we find that Defendants have failed to sustain their burden.  We, therefore, grant USIC's motion to enforce the arbitration provision as set out in the Agreement.

As noted above, the Agreement provided for two adjustments to the purchase price, the Working Capital Adjustment (Section 1.06(a)) and the Revenue Adjustment (Section 1.06(b)). In both instances, the Agreement details processes by which the parties were to determine the amounts of these adjustments.  With regard to the Working Capital Adjustment, the Agreement provides that, if the parties are unable to resolves their disputes related to the amount within 30 days, "all disputed matters raised by Purchaser [USIC] not so resolved shall be submitted to a national or regional accounting firm mutually agreed to" by the parties for resolution in accordance with the Agreement.[18]  Regarding the Revenue Adjustment, the Agreement provides:

---

[18] This term reads as follows, in full:

If Seller and Purchase are unable to resolve the disputed matters outstanding within such thirty (30) day period, all disputed matters raised by Purchaser [USIC] not so resolved shall be submitted to a national or regional accounting firm mutually agreed to by Seller [One Call] and Purchaser [USIC] (the "Independent Auditor"), for final resolution in accordance with the terms and provisions of this Agreement.  The Independent Auditor shall act as an arbitrator to determine only those issues still in dispute and the determination of the Independent Auditor shall either adopt the position of Seller or Purchaser or result in an adjustment that is within the range of those respective positions.  In resolving any disputed item, the Independent Auditor may not assign a value to any item greater than the greatest value for such item claimed by either party or less that the least value for such item claimed by either party.  The Independent Auditor shall make its determination based solely on presentations by Seller and Purchaser.  Notwithstanding the foregoing, in the event that a party does not comply with the procedural or time requirements of

"If Seller [One Call] and Purchaser [USIC] are unable to resolve the disputed matters outstanding within such (30) day period, all disputed matters raised by Seller [One Call] not so resolved shall be submitted to the Independent Auditor, for final resolution in accordance with Section 1.06(a)(iv)."  Neither provision provides any direction or limitation on a particular venue where the arbitration was to occur.

Defendants raise several arguments in opposition to USIC's motion to compel arbitration. First, disingenuously, we think, Defendants contend that the Magistrate Judge's February 27, 2012 Order granting them leave to amend their complaint resolved this issue.  In fact, that Order did not address the merits of USIC's arguments regarding the arbitrability of the amended counterclaims.  Rather, the Order reserved that issue for subsequent development by the parties, deeming it not suitable as grounds for opposing Defendants' request for leave to amend their pleading.  USIC has complied with the Magistrate Judge's direction by raising and briefing the issue in the context of its motion to compel.  We find no impediment to a ruling on this motion arising from or because of the February 27, 2012 Order.

Second, Defendants contend that there is a procedural bar to the relief that Plaintiff seeks in the motion to compel, namely, that a district court lacks authority to compel arbitration in

---

the Independent Auditor, the Independent Auditor shall render a discion based solely on the evidence it has which was timely submitted by the parties.  Seller and Purchaser shall use their respective Best Efforts to cause the Independent Auditor to make its determination as soon as possible, but in no event later than fifteen (15) calendar days after receipt of the disputed matters. Such determination shall be final, binding and conclusive upon the parties hereto.  The Independent Auditor's resolution of any such disagreement shall be reflected in a written report, which shall be delivered promptly to Seller and Purchaser.  All fees, costs, expenses and disbursements of the Independent Auditor shall be paid by each party in inverse proportion to the aggregate amounts awarded in accordance with Seller's position on disputed amounts and the aggregate amounts awarded in accordance with Purchaser's position on disputed amounts.  If a retainer is required by the Independent Auditor, the retainer shall be split equally between Purchaser and Seller; provided, however, that the retainer shall be considered part of the fees and expenses of such auditor and if either party has paid a portion of such retainer, such party shall be entitled to be reimbursed by the other party to the extent required by this Section 1.06(a)(iv).

Section 1.06(a)(iv).

another district under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.[19]  Section 4 of the FAA

provides as follows:

> The court shall hear the parties, and upon being satisfied that the making of the
> agreement for arbitration or the failure to comply therewith is not in issue, the
> court shall make an order directing the parties to proceed to arbitration in
> accordance with the terms of the agreement. The hearing and proceedings, under
> such agreement, shall be within the district in which the petition for an order
> directing such arbitration is filed.

9 U.S.C. § 4.  Defendants correctly argue that the Seventh Circuit has held that "a district court

compelling arbitration under §4 lacks the power to order arbitration to proceed outside its

district."  Jain v. De Mere, 51 F.3d 686, 690 (7th Cir. 1995).  However, where no forum is

specified, "[Section 4 of the FAA] not only permits but requires a court to compel arbitration in

its own district."  Id., see also Merrill Lynch, Pierce, Fenner, & Smith v. Lauer, 49 F.3d 323, 327

(7th Cir. 1995) (dismissing claims subject to arbitration under 12(b)(3) when the contract in

question contained forum selection clause that required arbitration outside of the district in which

the suit was filed).

    As noted above, the arbitration provisions in the Agreement invoked by USIC do not

specify where such arbitration would take place.  Rather, the Agreement requires only that the

Independent Auditor be a "national or regional accounting firm mutually agreed to by Seller and

Purchaser."  Section 1.06(a)(iv).  The fact that the parties previously agreed to engage an Illinois

accounting firm to serve as their Independent Auditor has no bearing on whether arbitration

should be compelled.

---

[19] As noted above, when the accounting process by which the parties were to determine the amount of the revenue
adjustment failed in December 2011, the parties apparently decided to submit the issue to Crowe Horwath LLP, an
auditing firm located in Illinois.  One Call decided not to participate in the arbitration, however, after a dispute arose
over whether USIC had provided representatives with certain documents that One Call asserts are necessary to
determine the amount of the revenue adjustment.

Next, Defendants argue that USIC has waived any contractual right it may have had to compel arbitration by virtue of its participation in this litigation.  Indeed, USIC did choose to file its own claims against Defendants in this litigation.  However, these claims raised before us – breach of contract and conversion – are not the subjects of USIC's motion to compel arbitration. Waiver of a contractual right to arbitrate can occur when "a party's conduct has been inconsistent with the arbitration clause so as to indicate that he has abandoned his right to arbitrate."  Brennan v. Kenwick, 97 Ill. App. 3d 1040, 1042 (Ill. App. Ct. 1st Dist. 1981).  We find nothing inconsistent with USIC's filing of *its* claims in the litigation before us while asserting its right to have One Call's counterclaims submitted to an arbitrator.  USIC did not waive its contractual right to seek arbitration of Defendants' counterclaims.

Finally, Defendants maintain that the agreement to arbitrate applies only to "mathematical accounting issues that the parties face related to adjustments to the deferred purchase price" and that, accordingly, the arbitration clause does not embrace all of the issues raised in their counterclaims.  In support of this argument, Defendants rely heavily on the fact that the Agreement between the parties contains a separate dispute resolution section.[20]  Beyond that, Defendants fail to provide any explanation or support for their assertion that the issues raised in their counterclaims fall beyond the terms of the agreement to arbitrate.  As previously quoted, the arbitration agreement applies to "all disputed matters" relating to the computation of the Final Twelve Month Period TTM Revenue.  The amount of the Final Twelve Month Period

---

[20] Section 12.12 states in relevant part:

> (ii) Any action or proceeding brought against Purchaser [USIC] permitted by the terms of this Agreement to be filed in a court, which action or proceeding is brought to enforce, challenge or construe the terms or making of this Agreement or any of the Related Agreements, and any claims arising out of or related to this Agreement or any of the Related Agreements, shall be exclusively brought and litigated exclusively in a state or federal court having subject matter jurisdiction and located in Chicago, Illinois, and Purchaser [USIC] hereby irrevocably submits to the jurisdiction of the state or federal courts having subject matter jurisdiction and located in Chicago, Illinois.

TTM Revenue will directly impact the Deferred Amount that USIC may or may not owe One Call.  Thus, issues relating to the calculation of the Twelve Month Period TTM Revenue, USIC's alleged failure to protect One Call's interest in the Deferred Amount by reducing revenues, and USIC's alleged failure to act in good faith during the accounting process as spelled out in the Agreement are clearly within the contemplation and reach of the arbitration agreement between the parties.

We note in conclusion that, by its own terms, the dispute resolution provision in Section 12.12 of the Agreement does not apply to our analysis of these issues.  Section 12.12 of the Agreement states that Illinois law shall apply in resolving disputes arising thereunder and that any action brought against USIC "permitted by the terms of this Agreement to be filed in a court" shall be brought and litigated in Illinois state or federal courts.  However, the arbitration agreement set out in Section 1.06 directs that disputes relating to payment of the Deferred Amount are to be decided by an arbitrator.  Hence, these arbitrable disputes are not ones "permitted by the terms of the Agreement to be filed in a court…."

## Conclusion

For the reasons detailed herein, USIC's motion for summary judgment is <u>GRANTED</u> and judgment accordingly shall enter against One Call and Graves, jointly and severally, on USIC's breach of contract and conversion claims.  USIC's motion to compel arbitration of Defendants' counterclaims and to stay litigation of the claims pending the arbitration is  also  <u>GRANTED</u>. The parties are ordered to pursue arbitration forthwith in accordance with their Agreement.  The litigation of Defendants' counterclaims pending before us is <u>STAYED</u> awaiting a resolution of the arbitration proceedings.  The case shall be administratively closed on our docket, subject to reopening or dismissal on motion of either or both parties at the conclusion of the arbitration.

IT IS SO ORDERED.


Date: _____03/01/2013_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jaime B. Herren
DOYLE LOW LLP
jherren@doylelow.com

Richard Proctor Doyle, Jr.
DOYLE LOW LLP
rdoyle@doylelow.com

Danford Royce Due
DUE DOYLE FANNING  & METZGER
ddue@duedoyle.com

Scott Ernest Andres
DUE DOYLE FANNING  & METZGER
sandres@duedoyle.com

Brian J. Paul
ICE MILLER LLP
brian.paul@icemiller.com

Christina Laun Fugate
ICE MILLER LLP
christina.fugate@icemiller.com

James L. Petersen
ICE MILLER LLP
james.petersen@icemiller.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com